MEMORANDUM OF DECISION
On May 26, 1999, the Department of Children and Families ("DCF" or "petitioner") filed a petition to terminate the parental rights of Norma M., mother, and David R., also known as Michael R., father ("David R."), to their child, Kelly M.[2] Trial concerning the petition was held on April 17-18, and June 12 and 14, 2000. For the reasons stated below, the court grants the petition.
FACTS
The court finds the following facts and credits the following evidence, except as noted.
A. Background of The Case
As noted, Kelly was born on February 22, 1997. On July 23, 1997, when Kelly was five months old, DCF filed a petition with the Superior Court for Juvenile Matters in Stamford alleging that Kelly was a neglected and uncared for child (the "neglect petition"). On that date, the court issued an order of temporary custody ("OTC") and Kelly was placed in foster care. Presenting issues involved allegations concerning Norma M.'s failure to properly care for Kelly's medical needs. Kelly was diagnosed with cellulitis, and had a large abscess on her back which had been left untreated and became infected.
On September 3, 1997, Kelly was adjudicated as an uncared for child. The OTC was vacated and Kelly was returned to Norma M.'s care under an order of protective supervision. On that date, the court entered Expectations as to Norma M. Exh. 2. Included among the court's orders were: (1) keep all appointments set by or with DCF, keep whereabouts known to DCF or your attorney; (2) participate in parenting counseling and parent aide (later the phrase "mother will continue to work with parent aide" was included as well); (3) secure/maintain adequate housing and income, including immediate application for Title XIX and keep DCF informed of all progress and/or needs; (4) mother will keep all medical appointments for child and administer all necessary medications; and (5) Norma M. was ordered not to leave the state without DCF's written permission and ordered not to move from the state without a court order. Id.
Ten days later, on September 13, 1997, Norma M. brought Kelly to the emergency room at Stamford Hospital. Upon examination, it was discovered that Kelly had fractures in both legs, including a broken left femur. The hospital made a referral to DCF based on suspected child abuse. Exh. 6. Kelly was placed in foster care again. On September 17, 1997, another OTC CT Page 9079 was issued by the court. Kelly has remained in foster care since that time.
On June 3, 1998, Kelly was adjudicated as a neglected child and her care and custody was committed to DCF for up to twelve months. On that date, new court Expectations were issued. Exh. 3. The court's orders included: (1) keep all appointments set by or with DCF, keep whereabouts known to DCF or your attorney; (2) visit the child as often as DCF permits; (3) participate in individual and parenting counseling as recommended by expert after evaluation;[3] (4) secure/maintain adequate housing and income; (5) no substance abuse; and (6) no involvement with criminal justice system. Exh. 3. Subsequently, Kelly's commitment was extended.
On September 8, 1999, after hearing, the court (Dennis, J.) terminated the visits between Norma M. and Kelly. Order granting previous Motion to Modify Visitation.[4]
By order dated March 13, 2000, the court granted, in part, a motion by Marisa F. and Carmine F., Norma M.'s sister and brother-in-law (and Kelly's aunt and uncle), to intervene as parties for the purposes of disposition only. They were permitted to present evidence as to disposition at the conclusion of the trial.[5]
On the first day of trial, David R. did not appear. As the court noted then, he previously had been defaulted by the court in connection with the petition, on July 21, 1999, after confirmation of service upon him by publication. In addition, the court noted that it had appointed Attorney Matthew Haine to conduct a search for David R. As his Affidavit of Search, dated February 18, 2000. reflected, he was unable to locate David R.
B. The Mother
Norma M. was born in 1971 in Peru. Most of her family, with the exception of her sister, Marisa F., who lives in Stamford, remains in Peru. Norma M. moved to the United States in April, 1994 or 1995, and began working as a housekeeper at a hotel in Stamford. There, she met David R., who was a guest at the hotel, in October, 1995. They began seeing one another and, in the next month, they visited David R.'s mother in South Carolina. They stayed there for one month, then moved to Georgia to live with David R.'s sister.
In Georgia, David R. obtained employment with a moving company and he and Norma M. "moved to their own apartment. In the fall of 1996, David R. left on a trip with his moving van and did not return. He was not CT Page 9080 heard from again. At this point, Norma M. was pregnant and unemployed.
After giving birth to Kelly in February, 1997, Norma M. moved to Stamford to live with her sister. She obtained employment as a housekeeper after she returned.
Norma M.'s criminal history includes felony convictions for assault in the second degree, risk of injury to a child, and failure to appear in the first degree. Exhs. 17, 18. The assault and risk of injury convictions stemmed from the September, 1997 fractures which were sustained by Kelly. Exh. 18 at 2-4. The failure to appear conviction resulted from a claimed failure to appear in court on September 21, 1998 in connection with the previous charges. Id. These convictions occurred on March 10, 2000, at the Superior Court in Stamford, after the court accepted Norma M.'s pleas of guilty to these charges under the Alford doctrine.[6] Exh. 18 (transcript of proceedings). The risk of injury conviction was pursuant to Conn. Gen. Stat. § 53-21 (1). Id. at 2. The court approved an agreed-upon disposition and sentenced Norma M., on the risk of injury conviction, to seven years incarceration, suspended after serving eighteen months, and five years of probation. On the other two convictions, she received sentences of five years in prison, suspended after eighteen months, and five years probation, with all three sentences to be served concurrently. Exhs. 17, 18.
Special conditions of probation imposed by the court included:
 any psychiatric or psychological counseling for you deemed necessary by Probation. Also, that you have no contact with the minor child, unless permitted to do so by order of this court or any other court of competent jurisdiction.
"Exh. 18 at 9. Norma M.'s attorney confirmed to the sentencing court that these conditions had been discussed among counsel. Id. At the time of trial on the petition, Norma M. was incarcerated. Prior to that time she had maintained housing and was employed. There is no evidence that she engaged in substance abuse.
C. The Father
David R. was reported to have been born in 1969 or 1970. Reportedly, he was a high school graduate. Apparently he used a deceased brother's name ("Michael") to avoid being in trouble.
Reportedly, he left this country for Mexico. He has had no contact with Kelly. He has never presented a plan for her care. He has never made CT Page 9081 himself available to serve any kind of parental role in her life.
D. Kelly and Her Progress In Foster Care
Kelly was first hospitalized at Stamford Hospital in May, 1997. She was diagnosed with cellulitis. At the emergency room her temperature was 103°F. Exh. 10 (Discharge Summary) at 1. She remained hospitalized for eight days. Id. at 2. An extensive consultation with the hospital's social services department occurred involving Norma M., Marisa F., and Carmine F. Id.
One month later, in June, 1997, Kelly was again at the hospital. She was diagnosed with hypoglycemia and seizure. Exh. 11 (Discharge Summary). After becoming stabilized, she was transferred to Westchester County Medical Center one day later. Id. at 2. At that hospitalization, an examining physician suspected that Norma M. had been incorrectly diluting Kelly's formula, leading to her having low blood sugar. This could have been fatal.
A third hospitalization occurred less than one month afterwards. After being advised by the Children's Health Clinic (the "Clinic") to bring Kelly to the Stamford Hospital Emergency Room due to Kelly having a back abscess, cellulitis, and fever, Norma M. did not promptly do so. The police were called and they brought Norma M. and Kelly to the hospital. Exh. 12 (Discharge Summary) at 1.
The Clinic prepared a report of suspected child abuse/neglect as a result of seeing Kelly's condition. Exh. 5. Her breathing was shallow and she had a fever of 104°F. Id.
Kelly remained hospitalized for ten days. Exh. 12 (Discharge Summary) at 1. After treatment for the abscess, which was described as "an intense, red, warm swollen area," she improved. Id. During this hospitalization, a hospital nurse informed DCF that Norma M. would not heed medical staff advice concerning addressing Kelly's needs. Exh. E, DCF narrative, dated July 18, 1997.
Due to Norma M.'s failure to bring Kelly in for evaluation upon noting the problem, her refusal to go to the emergency room from the Clinic, and that this was the second "major skin infection Kelly had had, she was placed in foster care upon discharge. Exh. 12 at 2. Stamford Hospital staff noted also Norma M.'s poor comprehension and possible intellectual limitations." Exh. D (Nursing Dept. Pediatric Patient Progress Record) dated July 22, 1997. A letter from Dr. Katsetos, dated July 21, 1997, noted that the causes of Kelly's infection were "impaired immune system or inflicted infection." Exh. D. The infections she had had were "very CT Page 9082 unusual." Id.
As noted, Kelly was returned to Norma M's care on September 3, 1997. At that time, her assigned DCF social worker was Kristen N. Greene, who testified at trial. She noted that when she transported Kelly to her mother's home on that date, Kelly, as she often did, briefly displayed signs of anxiety and then "was calm and comfortable when this worker left her. Kelly did not behave unusually did not appear to be in any sort of pain, her body (i.e. legs) appeared to be functioning with strength and mobility." Exh. D (Social Worker Affidavit, dated October 28, 1997).
When Kelly was returned to Norma M.'s care on September 3, Ms. Canas, a parent aide, already had been assigned to assist Norma M. This parent aide had begun to work with Norma M. after Kelly's first removal in July. Ms. Greene made an appointment for Ms. Canas and herself to visit Norma M. at her home on September 9. Although Norma M. expected them for the home visit on that date, she was not there when they arrived and that visit did not occur.
As discussed above, Kelly was hospitalized at Stamford Hospital, for the fourth time in her short life, on September 13, 1997. Norma M.'s various explanations for the cause of Kelly's injuries are not credited by the court. At the time of initial evaluation on that date, Norma M. told the examining nurse that Kelly "was jumping" on September 11 and, since then, her leg became swollen. Exh. 8 (referral to DCF). According to the hospital's Pediatric Admission Note of September 13, Exh. 13, Norma M.'s explanation was that "baby was kicking side of crib and got leg caught under pillow or blanket." Id. at 1. Significant swelling had occurred before Norma M. sought medical attention for Kelly. Id. The report stated further "Mom does not know how injury occurred other than above explanation." Id.
After further physical examination, a right tibia-fibula fracture, a left comminuted (broken in more than one place) femur fracture, and a left comminuted tibia fracture were diagnosed. "Physical abuse" was designated as the cause. Exh. 13 at 2. Kelly's fractures were treated and she was placed in a full lower extremity hip Spica cast. Exh. D (Operative Procedure report).
In an interview with police on September 13, 1997, Dr. Powell, an emergency room physician, told them that Kelly's injuries were "recent" and "inflicted." Exh. D (Incident Report). Dr. Powell also stated that the injuries appeared to be two to five days old. Exh. D (Incident Report Narrative Supplement, dated September 13, 1997). On September 16, 1997, Dr. Weiner of Stamford Hospital noted, after evaluating Kelly's x-rays, that her lower leg fractures apparently preceded the fracture of her left CT Page 9083 femur by ten days to two weeks duration. The most recent injury was less than one week old. This finding was "highly suggestive of child abuse case, and definitely neglect due to delay treatments of leg [fractures]." Exh. D (letter of September 16, 1997). The typical cause of a comminuted fracture is a "severe blow or crushing force;" and its distinguishing feature is "bone broken into three or more fragments." Exh. D, submitted as "Medical Definitions" at 249. Dr. Stephen Cohen, a radiologist, also reviewed the x-rays and found fractures which were less than five days, at a maximum one week old. Such injuries take a lot of direct, blunt force to cause. The findings suggested a non-accidental injury.
Dr. Powell of Stamford Hospital was interviewed also by the court-appointed evaluator, Dr. Penn. (Dr. Penn's testimony and report are discussed, infra, at 15-17.) Dr. Powell confirmed that no immunological deficiency caused Kelly's injuries. He concluded that they were caused by child abuse.
When DCF and the police began to investigate the cause of Kelly's fractures, Norma M. attempted to blame Kelly's foster family for the injuries. DCF's investigator, Mr. Scott Harvey, met with Norma M. on September 13, the day she took Kelly to the hospital. She stated that Kelly was "very quiet and did not move much" on September 3, the day she was returned. Exh. 4 (Careline Investigation Narrative, at 3). She claimed that, on the next day, she heard Kelly screaming and saw redness near one of Kelly's ankles, and some swelling, but did not think medical attention was required. Id. Supposedly, during the rest of the week the swelling would "come and go." Id. at 4. Later, after saying she had misunderstood the question, Norma M. changed the date she said Kelly was screaming to September 10. Id. at 6.
On the day of taking Kelly to the hospital, September 13, she claimed she saw bruises on both of Kelly's legs and that she and her sister decided to take Kelly to the hospital. Id. at 4. Norma M. told Mr. Harvey that Kelly had been in her care since she returned from foster care. Id. He also interviewed her sister, Marisa F., who told him "that since Kelly was returned on the 3rd of September she seemed to be generally healthy." Id. at 6. Norma M. claimed to Mr. Harvey that "she thought that the injuries were initially caused while in the foster home and that they were re-injured when Kelly hit her legs on the railings of the crib" on September 10. Id. at 7.
Stamford police investigators interviewed Norma M on September 14, 1997. They were shown the residence where Norma M., Marisa F. and Carmine F. lived. All shared the same bedroom; Kelly had slept in a crib in that room as well. Exh. D (Incident Report), p. 1 of 2. To the police, Norma M. claimed to have noticed redness on Kelly's legs on August 27, at a CT Page 9084 visit when Kelly was still in foster care. Id. In a written statement on September 14, 1997, she claimed that Kelly "got hurt in her crib or hurt at the foster home." Exh. D (Statement).
Later in September, 1997, Kelly was examined at Stamford Hospital's Orthopedic Clinic. They could not find any evidence that Kelly suffered from brittle bone disease, which eliminated that as a potential cause of Kelly's injuries. Exh. D (Incident Report Narrative Supplement, dated October 1, 1997; DCF Report of Health Care Visit, dated September 30, 1997, including statement "Appears to be abuse," signed by John Carino, M.D.).
After Kelly's release from the hospital, she was placed in foster care. DCF considered placing her with Marisa and Carmine F., her aunt and uncle. However, in view of the fact that Kelly had been injured in their home, where she slept in the same bedroom with them, her future safety with them was in serious question. Since they had not kept Kelly safe in the past, foster care was determined to be in her best interest.
DCF was able to place Kelly again in September, 1997 with the same foster mother who had cared for her after her July, 1997 removal. Within weeks of her placement with her foster mother, Kelly had bonded with her. In November, 1997, a follow-up evaluation discussed Kelly's bond with her foster mother and her "intense stranger anxiety" in her foster mother's absence. Exh. D (three page report of M. White and N. Hassam at 3).
At the end of January, 1999, after she had been advised of Dr. Penn's recommendations (see infra at 16-17), Norma M. advised DCF and Ms. V. that she had seen her toddler nephew break Kelly's legs by jumping up and down on her. Exh. E., DCF narratives, dated January 28 and January 29, 1999. Norma M. continued to have no explanation for how the fractures differed in age. Id., DCF narrative, dated February 4, 1999. Her excuse for her delay in relating this explanation was her concern that her nephew would be removed from his home. Id.[7] On the same date, DCF had to instruct Norma M. not to show Kelly how to spank and slap dolls which were present in the visiting room. Id.
Kelly remains bonded to her foster family, with whom she has lived for over two-and-a-half years, since September, 1997. They have expressed interest in adopting Kelly.
Kelly's injuries have healed well. By the time of Dr. Penn's evaluation, she exhibited a normal gait, was able to run, and was not under medical care, except for well-child visits. CT Page 9085
E. Efforts at Reunification and Rehabilitation
As noted, when Kelly was returned to Norma M's care on September 3, a Spanish-speaking parent aide from the Exchange Club, Ms. Canas, continued to be assigned to assist her. DCF also facilitated visitation for Kelly and Norma M. Ms. Greene, who was the assigned social worker until December 1, 1997, described the five visits she observed between them. For example, at an August 18, 1997 visit, Kelly could not be calmed by her mother for a long period. Rather, Kelly was frantic for a substantial portion of the visit. Norma M. had few skills in caring for Kelly; initially her focus was on cutting Kelly's nails. In general, Norma M. did not know what to do with Kelly.
At visits, the parent aide's duties involved helping Norma M. with parenting skills, including the basics of diapering, when to intervene, and developmental milestones. Ms. Greene asked a DCF nurse to help educate Norma M. and her sister. Also, at visits. Ms. Greene tried to provide instruction for Norma M. as well.[8] Prior to the September 13 events, Norma M. also had an assigned Department of Social Services worker to assist her in following up on applying for medical coverage.
Promptly after the September, 1997 OTC, Norma M. was sent for a court-ordered psychological evaluation. Exh. B (report of Dr. Rodolfo Rosado, Ph.D), faxed October 26, 1997. DCF also referred her to Carlos Salguero, M.D., for a psychiatric evaluation. Exh. C (Dr. Salguero's report), dated November 12, 1997.
Dr. Rosado found that Norma M. was confused about recent events. He noted that the DCF reports he reviewed only referred to Kelly being treated for an infection, not for broken legs. Exh. B, at 2. He found that her confusion made it impossible to fully comprehend her; discrepancies in her accounts of events caused doubt about their accuracy and validity. Id. at 3. He assessed her as in the borderline range of intellectual functioning. Id. at 5. Her mental confusion led him to believe that further assessment was warranted. Id. at 6. He stated that she "does not presently have the abilities necessary to function adequately as a single parent." Id. The provisional diagnosis was that she had a depressive disorder. Id. He suggested that Norma M.'s sister and brother-in-law be evaluated as possible caretakers for Kelly. Id. at 8. He also questioned Norma M.'s ability to assist her attorney and recommended additional evaluations. Id. at 9. He also recommended counseling with a bilingual Latina therapist. Id. at 10.
Dr. Rosado's evaluation was preliminary in nature and based on limited information. He did not observe any interaction between Norma M. and Kelly. Several of his recommendations were adopted. Norma M. was referred CT Page 9086 to counseling and became engaged in it on a weekly, ongoing basis with Ms. Marcia Velez, a Spanish-speaking counselor from the Family Center. She was also evaluated by two psychiatrists. Finally, her sister and brother-in-law were considered, but rejected, as caretakers for Kelly.
Dr. Salguero's report reflects that his evaluation included review of DCF records which discussed Kelly's fractures. Exh. C at 1. He found Norma M. to be of average or below average intelligence, and to be a person who was dependent on the advice of others. Id. at 5. She was slightly depressed and she did not understand the seriousness of the trauma to Kelly. Id. at 6. He suggested that she was in need of parenting classes and counseling to help her to develop the abilities to look after her child's needs. Id. at 7-8. As noted, while Norma M. was not provided with parenting classes, she had been provided with instruction from a DCF nurse, briefly had a parent aide, and most important, as discussed, she became engaged in individual counseling.
Norma M.'s competency was evaluated by Stephen P. Herman, M.D., a psychiatrist. Exh. A (Dr. Herman's report), dated March 30, 1998. He, too, found her to be a sad. confused woman, with significantly below average intelligence. Id. at 2. He concluded that she was competent and that she understood the allegations in general and would be able to work with an attorney. Id. at 3.
From December, 1997 to January, 1999, Ingrid Aarons was the assigned DCF social worker. In February, 1998, she referred Norma M. to Ms. Velez for individual therapy. Ms. Velez also attended at least three of Norma M.'s visits with Kelly.[9] Ms. Velez's counseling of Norma M. covered providing her with emotional support in connection with Norma M.'s depression, dealing with not having her daughter in her care, and working on independence.
In addition, bi-weekly visits continued. Ms. Aarons supervised the majority of these visits. In general, the visits were traumatizing for Kelly. While some visits went better than others, there "was no real attachment between her and her mother. Kelly would cry from being brought in the door. Norma M.'s frequent focus was on clipping Kelly's nails and changing her clothes. Norma M. did not hold Kelly much. Kelly was uncomfortable and often had to be calmed by Ms. Aarons or by her foster mother. Norma M. essentially treated Kelly as if she were a doll. Ms. Aarons was unsuccessful in convincing Norma M. to refrain from changing Kelly's clothes and clipping her nails. During visits she tried to coach Norma M. concerning parenting skills, including such basics as advising Norma M. to pick Kelly up, to explore the room, and to try to interact. Instead of looking to her mother for reassurance, Kelly looked to Ms. Aarons for the same. She was more comfortable with the social worker than CT Page 9087 she was with Norma M., although they saw each other with the same regularity, every two weeks.
By January, 1999, Kelly was referring to her foster mother as "mama" and to Norma M. as "the lady." Exh. E, DCF narrative, dated January 21, 1999. By April, 1999, Kelly refused Norma M.'s efforts to get Kelly to call her "Mommy." Kelly responded that Mommy was not there, referring to her foster mother. Id., DCF narrative, dated April 23, 1999. She continued to refer to her mother as "the lady." By June, 1999, they had little or no interaction. Kelly asked her mother to put her down, to let her go, and to go home during a visit in June, 1999. Id., DCF narrative, dated June 15, 1999.
Norma M. regularly attended the scheduled visits. She also attended administrative case reviews concerning treatment plans. Marisa F. attended approximately four visits during Ms. Aarons' tenure as the social worker on the case.
F. Court-ordered Evaluation by Dr. Penn
Dr. Joseph V. Penn, M.D., then of the Yale University Child Study Center, performed an evaluation for the court. He testified at trial and, by stipulation, was qualified as an expert in child psychiatry, forensic psychiatry, and medicine. Besides interviewing Norma M. on two separate occasions, he observed interactions between Kelly and Norma M. and between Kelly and her foster parents. He reviewed an array of medical records and spoke to a number of professionals who had been involved in the case, including Ms. Velez, Norma M.'s individual therapist. In addition, he briefly spoke by phone with Marisa F.[10]
Dr. Penn found that Norma M. was depressed. She was alert and oriented to person, place, date, and the purpose of the evaluation. Her attention and concentration were intact.
At the scheduled interaction with her mother, Kelly began crying as soon as Norma M. entered the room. She climbed onto her foster mother and held onto her. When Norma M. approached, Kelly exhibited significant distress. When her foster mother stood up, Kelly became upset. When the foster mother attempted to facilitate a transition to have Kelly play with her mother, Kelly again was in distress and remained so even after Norma M. left the room.
Subsequently, Norma M. returned. After the foster mother left the room, there was no significant verbal contact between Kelly and Norma M. Norma M. showed no common sense in dealing with her. She was not able to engage Kelly in sustained play. When her foster mother returned, Kelly CT Page 9088 referred to her as "Mommy." Kelly then showed no interest in Norma M., turned her back on her, and interacted with her foster mother instead.
Dr. Penn's observations of the separate interaction between Kelly and her foster parents showed a close bond between them and Kelly. She sought her foster mother for physical comfort and re-assurance.
As to the fractures, Dr. Penn concluded that Norma M.'s explanation, which she repeated to him, that the injuries occurred while Kelly was in foster care, was inconsistent with the radiological and physical findings and the injuries which were sustained.[11]
Kelly has done very well since being placed with her foster family. No other unexplained medical problems have developed. She is on track developmentally. She is psychologically attached, in particular, to her foster mother.
Dr. Penn noted that
 [e]ven if [Norma M.] received additional psychiatric, neurological, speech and language evaluations, and if she received an adequate therapeutic trial of medication for her depression in addition to her current individual therapy, it would not change the fact that Kelly does not feel safe or comfortable in [Norma M.]'s presence. This discomfort is most probably based on the consistently noxious and incompetent care provided to Kelly by [Norma M.].
Exh. 16 (Dr. Penn's report, dated November 17, 1998), at 19.
In summary, he characterized the parent-child interaction as the worst he had seen. While he would not expect a child of Kelly's age to have a recollection of the trauma she had experienced, a child of her age can recall the pattern of reactions she has had with her parent. Here, Kelly initially screamed and shrieked in response to her mother.
If she had been consistently getting good care from her mother, an appropriate parent-child relationship would be expected to develop even though the child was placed in foster care. Dr. Penn recommended that Norma M.'s visits should cease and that Kelly should live permanently with her foster family. Id.
G. Marisa F. and Carmine F.
The intervening parties proposed themselves as care givers for Kelly. CT Page 9089 They have been married since 1995. Marisa F. and Carmine F. have two sons, ages three years and three months and four years and eight months.
Contrary to the medical evidence, Marisa F. testified that she believed Kelly had already been injured in foster care when DCF returned her to Norma M.'s care in early September, 1997. While she initially noted no swelling, supposedly Kelly's leg had a red spot on it. According to her, the baby looked different. While Kelly was in Norma M.'s care, Marisa F. held Kelly when she was returned. She acknowledged that Kelly was not taken either to a doctor or to a hospital between September 3, 1997 and September 13, 1997. The court does not credit Marisa F.'s testimony concerning Kelly's injuries having been allegedly received in foster care, since it was contradicted by the medical evidence. In his testimony, Carmine F. stated he does not know how Kelly was injured.
After Kelly's second removal, Marisa F. occasionally visited Kelly. She last saw her in August, 1999. Her parents have advised her to fight for Kelly's custody. Marisa F. also testified that Kelly is not bonded to her foster mother. This testimony is not credited either; it is contradicted by Dr. Penn's testimony and evaluation, as well as by the DCF narratives, which have been discussed above.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112
(c)(1). The word "reasonable" is the "linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof." (citation and internal quotation marks omitted.) In re Amber B., 56 Conn. App. 776, 784 (2000). Our Supreme Court has found that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2nd Ed.). State v.Antrim, 185 Conn. 118, 122 (1981) (citations omitted). More recently, in the termination of parental rights context, the Appellate Court stated that "reasonable efforts mean doing everything reasonable, not everything possible." (citations and internal quotation marks omitted) In re AmandaA., 58 Conn. App. 451, 455 (2000).
In accordance with § 17a-112 (c)(1), DCF may meet its burden concerning reunification in one of three ways: (1) by showing that it CT Page 9090 made such reasonable efforts; (2) by showing that the parent was unable or unwilling to benefit from reunification efforts; or (3) if the court previously determined that such efforts were not appropriate. By clear and convincing evidence, DCF has sustained its burden in the first two of these three ways as to Norma M. As to David R., clearly and convincingly, DCF has shown he was unable or unwilling to be involved in any way, let alone be reunified with Kelly. In view of these circumstances, DCF could not make efforts as to David R.
The record demonstrates that DCF provided appropriate services to Norma M. in order to facilitate reunification. In accordance with the earlier Expectations, her parent aide remained assigned to her until after Kelly's second removal in September, 1997. Following that, the entire character of the case necessarily changed. The psychological and psychiatric evaluations were promptly undertaken thereafter. Both Dr. Rosado and Dr. Salguero recommended individual counseling, which DCF facilitated. In February, 1998, six months before Dr. Penn interviewed her, Norma M. began weekly individual counseling with Ms. Velez. In order to assist Norma M., Ms. Velez attended some of the visits between Kelly and Norma M.
While the original Expectations called for parenting counseling, the subsequent Expectations, entered in June, 1998 at the time of the neglect adjudication, ordered individual and parenting counseling as recommended by the court-ordered expert after his or her evaluation. During the period leading up to Dr. Penn's evaluation, Norma M. continued to have the benefit of individual counseling with Ms. Velez.
DCF also provided regular visitation for Norma M. with Kelly. At visits, Norma M. was provided with advice by DCF as to how to better interact with Kelly; unfortunately, such advice was not heeded. Norma M. attended visits on a consistent basis. In view of the poor overall quality of the parent-child interactions, progress was not made to more frequent, and unsupervised visits. After Dr. Penn recommended it, the court terminated the visitation.
As noted, Dr. Penn concluded that even if Norma M. were to receive additional treatment, it would not accomplish reunification. Without question, Kelly developed a negative reaction to her mother.
In this type of case, the court reasonably may rely on the opinion of an expert witness. In re Eden F., 250 Conn. 674, 706-707, motion for en banc reargument denied, 251 Conn. 924 (1999). The court credits Dr. Penn's views as to the impossibility of reunification here. The statutory duty to make reasonable efforts to reunify does not oblige DCF to accomplish a successful result. In re Natalia G., 54 Conn. App. 800, 803
CT Page 9091 (1999).
Under the circumstances here, the court is unpersuaded that attendance at parenting classes by Norma M. would have added anything significant to the reunification effort. Norma M. received one-on-one counseling on a weekly basis. Her counselor attended some of the visits. Norma M. also resisted appropriate advice about how to act with Kelly at visits, just as she had earlier failed to "follow medical advice. The court credits Dr. Penn's view that Kelly's hostility to her mother developed over time as a result of the poor care she received from her. Parenting classes would not have changed the situation.
DCF has established that, under these circumstances, it made reasonable efforts to reunify Norma M. with Kelly. It has also proved that she was unable or unwilling to benefit from those efforts. DCF has satisfied its burden of proof as to reunification.
B. Statutory Grounds
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512 (1998), cert. denied, 247 Conn. 919 (1998). Conn. Gen. Stat. 17a-112 (c)(3).
DCF has alleged the grounds of abandonment and no ongoing relationship as to David R. As to Norma M., DCF, has alleged failure to rehabilitate, acts of commission and omission, and no ongoing relationship. The court finds that DCF has proved each ground by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment." (citations and internal quotation marks omitted) In re Roshawn R.,51 Conn. App. 44, 52 (1998).
 The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child: (2) express personal concern over the health, education and general well-being of the child; (3) the duty to CT Page 9092 supply the necessary food. clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.
Id. at 53 (citations and internal quotation marks omitted).
"Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re MigdaliaM., 6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "`maintain' implies a continuing, reasonable degree of concern." Id. at 210.
More than a merely sporadic showing of interest, concern or responsibility for the child is required by the statute. In re Shane P.,58 Conn. App. 244, 251 (2000); In re Angellica W., 49 Conn. App. 541, 551
(1998). The test is not limited to whether a parent has shown some minimal interest in the child. In re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14-15 (1981); In re Rayna M., 13 Conn. App. 23, 36 (1987). Statutory abandonment, as opposed to common law abandonment, does not require proof of an intention to abandon totally or permanently. In reShannon S., 41 Conn. Sup. 145. 151 (1989), aff'd per curiam,19 Conn. App. 20 (1989). Moreover, parental "interest" in the child is not the criterion for the determination as to whether abandonment has occurred; rather, the statute requires interest, concern and responsibility "as to the welfare of the child." In re Rayna M., supra,13 Conn. App. 36-37.
Without question, since Kelly's father has never come forward to play any role in Kelly's life, abandonment has been proved, clearly and convincingly, as to David R. He has done nothing at all by way of being a parent to Kelly after her birth.
2. Failure to Rehabilitate
This statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). The court previously has found Kelly CT Page 9093 to have been both uncared for and neglected, thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112
(c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167 (1989); In re HectorL., 53 Conn. App. 359, 366-67 (1999).
 `Rehabilitate' means `to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation.' [Webster's] Third New International Dictionary. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of what which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life.
(internal quotation marks and citations omitted.) In re Eden F.,250 Conn. 706.
As the Appellate Court recently noted In re Sarah Ann K.,57 Conn. App. 441. 448 (2000), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." (internal quotation marks and citation omitted.) At the adjudicatory phase, the question is whether Norma M. was better able to be a parent to Kelly when the petition was filed than at the time of her commitment. See In re Michael M., 29 Conn. App. 112, 126 (1992). As noted, the petition was filed on May 26, 1999, almost one year after the neglect adjudication and commitment on June 3, 1998.
This type of inquiry "require[s] the court to obtain a historical perspective of the respondent's child caring and parenting abilities." Inre Sarah Ann K., supra, 57 Conn. App. 449. Based on the foregoing discussion, the evidence is clear and convincing that Norma M. is not able to assume a responsible position in Kelly's life, nor could she CT Page 9094 become able to do so within a reasonable time. The foregoing discussion concerning her inability or unwillingness to benefit from reunification,supra, at 18-20, is relevant here as well and need not be repeated.
In this case, there were two significant barriers to rehabilitation. First, Norma M. never clearly acknowledged responsibility for what befell Kelly in her care. As discussed, the evidence is clear and convincing that Kelly suffered two separate incidents involving leg fractures while she was in Norma M.'s care. After the first, medical attention was delayed. This established a pattern of serious neglect which began with evidence of delay in getting treatment for Kelly's previous abscess. Second, the poor care she provided to Kelly led to the failure to establish a parent-child bond between Kelly and Norma M. Again, the court credits Dr. Penn's evaluation and testimony in this area. Kelly has demonstrated a uniquely negative attitude towards her mother.
While in foster care, Kelly's needs had to be met by others. She became bonded to her foster parents, particularly to her foster mother.
Norma M. did violate one of the Expectations, concerning no future involvement in the criminal justice system, by not appearing in court and receiving a felony conviction for failure to appear as a result. Notwithstanding this transgression, Norma M.'s situation differs from many in which failure to rehabilitate is alleged. Here, Norma M. went to visits and to counseling. Nonetheless, no progress was made in establishing a healthy parent-child relationship. Without question, under such circumstances, Norma M. cannot assume a responsible position in Kelly's life, nor could she do so in the future. This is apart from the fact that she is facing many more months of incarceration as a result of her criminal convictions. The evidence is clear and convincing that rehabilitation did not occur and cannot occur.
3. No Ongoing Relationship
DCF also alleges that there are ongoing parent-child relationships between Kelly and either of her parents. To prove this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(D); In re Savanna M.,55 Conn. App. 807, 815 (1999). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them. or has definitely lost that relationship, so that despite its former existence CT Page 9095 it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. at 646. As the Appellate Court recently noted, "the feelings of the child are of paramount importance."In re Tabitha T., 51 Conn. App. 595, 602 (1999). "Feelings for the natural parent connotes feelings of a positive nature only." Id.
Clearly and convincingly, there is no ongoing relationship between Norma M. and Kelly within the statutory definition. The relationship Kelly had as an infant with her mother prior to the two OTCs was characterized by lack of care. Fortunately, Kelly has developed healthy relationships with her foster parents. Those relationships, particularly her closely bonded relationship with her foster mother, have completely displaced any Kelly had with Norma M. Kelly has no positive feelings towards her mother. There is no evidence of positive memories either.
Having found that there is no ongoing relationship, the court is required to determine whether it would be in Kelly's best interest to allow additional time for one to be established. The factors to be considered include "(1) the length of stay with [her] foster parents, (2) the nature of [her] relationship with [her] foster parents, (3) the degree of contact maintained with the natural parent and (4) the nature of [her] relationship with [her] natural parent." In re Savanna M.,supra, 55 Conn. App. 816.
Applying these factors leads, clearly and convincingly, to the conclusion that no further time is warranted for Norma M. to establish a positive relationship with Kelly. Kelly has been living with her foster family since September, 1997, now over two years and nine months, the substantial majority of her life. There, she has found the nurturing and stability which every child needs. Due to the negative quality of their interaction, Dr. Penn recommended that Norma M. should have no further contact with Kelly. Kelly and Norma M. do not have a relationship, except to the extent that Kelly recognized Norma M. as a person who visited her and to whom she negatively reacted. Clearly and convincingly, her best interest would not be served by allowing more time for Norma M. to establish a relationship with Kelly.
As to David R., no relationship was ever established between him and Kelly. In view of the length and strength of Kelly's relationship with her foster family and the lack of any contact between her and David R., there is no reason to permit more time for such a relationship to develop. Clearly and convincingly, DCF has sustained its burden as to David R. on this ground as well. CT Page 9096
4. Acts of Commission or Omission
In P.A. 98-241, the General Assembly amended § 17a-112 (c)(3)(C), concerning the ground of parental acts of commission or omission, which reads:
 (C) the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights;
Under this statute, as amended, the grounds are not limited to serious physical injury. The words "severe physical abuse or pattern of abuse" make it clear that something other than severe physical injury may be proved to show that a child has been denied "the care, guidance or control necessary for his physical, educational, moral or emotional well-being." Id. See, In re Sean H., 24 Conn. App. 135, 144 (1991) ("There is nothing in this clear statutory language that limits the acts of commission or omission to the serious physical injury of a child, rather than the serious emotional injury of a child."), cert. denied,218 Conn. 904 (1991).
In addition, by the terms "but not limited to" the section "clearly indicates that `including' is meant as a term of expansion." State v.Jones, 51 Conn. App. 126, 137 (1998), cert. denied, 247 Conn. 958
(1999). Thus, this ground may relate to a wide variety of conduct. Statev. Anonymous, supra, 179 Conn. 155, 164-165 (1979).
The statute does not define the phrase "severe physical abuse." Where a statute does not provide a definition, its "commonly approved usage" is to be employed. Conn. Gen. Stat. § 1-1(a); State v. Hodge,248 Conn. 207, 263 (1999), cert. denied, 1999 U.S. LEXIS 7157 (1999). To ascertain such meaning, "it is appropriate to look to the dictionary definition of the term." In re Darlene C., 247 Conn. 1, 12, n. 29 (1998). Webster's Third New International Dictionary ("Webster's") has been cited by the Supreme Court as a source for such definitions. Id at 29. "Abuse" is defined in Webster's, at 8, as "to use or treat so as to injure, hurt or damage . . . ." "Serious physical injury `means physical injury which creates a substantial risk of death, or which causes serious CT Page 9097 disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ. . . .' General Statutes 53a-3 (4)."State v. Barnett, 53 Conn. App. 581, 592, cert. denied, 250 Conn. 918
(1999).
Causing Kelly, a seven month old baby, to suffer multiple fractures to her legs amounts to serious physical abuse. The medical evidence showed that substantial force was used to break Kelly's legs. The court rejects Norma M.'s belated explanation that her toddler nephew did so. That version of events does not explain the separate fracture events. It was offered only after a long period of delay and in the face of a termination recommendation by Dr. Penn. It followed other incredible explanations, such as that Kelly's legs were broken before she was returned on September 3, 1997. Kelly was under Norma M.'s care when she was seriously hurt. Her serious physical injuries remain inadequately explained. This prima facie evidence was not rebutted and constitutes. according to § 17a-112 (c)(3)(C), sufficient evidence of a ground for termination.
The statute also does not define the term "pattern." In Webster's "pattern" is defined (in the most closely related context) as "a reliable sample of traits, acts or other observable features characterizing an individual (behavior [pattern]) . . . ." Id. at 1657.
Reference to the usage of a term in another statute may be useful in ascertaining its meaning. In Chapter 949c, concerning the Corrupt Organizations and Racketeering Act ("CORA"), Conn. Gen. Stat. § 53-394
(e) defines a "pattern of racketeering activity" as requiring at least two incidents "that have the same or similar purposes, results, participants, victims or methods of commission or otherwise are interrelated by distinguishing characteristics. . . ." The incidents cannot be "isolated incidents." Id. Also, they must have occurred within five years of each other. Id.
Norma M.'s failures to secure prompt medical attention for Kelly in July, 1997 (concerning her abscess), and in September, 1997 (after the earlier of the fracture incidents), coupled with the inadequately explained fractures, amount to a pattern of related acts, since the separate incidents are so closely related in time. Under § 17a-112
(c)(3)(C), this pattern of repeated danger and injury to which Kelly was subjected denied her the care necessary to her physical well-being. Clearly and convincingly, DCF has satisfied its burden on this ground as well.
DISPOSITION OF THE TERMINATION PETITION
CT Page 9098
In the disposition phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112
(c)(2); In re Juvenile Appeal (83-CD), 189 Conn. 276, 285 (1983). The court can consider all events occurring through the close of the disposition hearing. Practice Book § 33-5.
Because of the deleterious effects of prolonged temporary placement, "time is of the essence," for Kelly. In re Antony B., 54 Conn. App. 463,476 (1999); In re Alexander V., 223 Conn. 557, 565 (1992). The Appellate Court has "consistently held that to allow a child to languish in foster care is not in the child's best interest." In re Drew R.,47 Conn. App. 124, 131 (1997). Our Supreme Court has noted that "long-term stability is critical to a child's future health and development." (citation omitted) In re Eden F., supra, 250 Conn. 709.
As a preliminary matter, the court will address the evidence offered by the interveners. In their closing arguments, Marisa F. and Carmine F. argued that they had always sought to care for Kelly and that they were not adequately investigated by DCF as resources before Kelly bonded with her foster parents. They asserted that, here, where Kelly had lived with them and they did visit her after placement, they should have been provided with the opportunity to care for her. In contrast to Norma M.'s situation, they contend that there is no psychiatric evidence saying it would be traumatic for Kelly to be placed with them. They asked for a court order requiring DCF to conduct at-home visits and to investigate them as resources for Kelly.
Where a child "should reside and with whom, however, are not questions that relate to whether it is in his best interests to terminate his relationship with his parents." In re Denzel A., 53 Conn. App. 827, 834
(1999). A relative's intervention is authorized not to effect an adoption or to obtain custody but for the purpose of affecting the termination itself. Id. at 835. As noted in Denzel A., in a case where termination was warranted, delay in termination would result in delay in finding a permanent home for the child, whether that home should be with a relative or with some other person or persons. Id. More recently, the Appellate Court added that, "[t]he presence of a compelling interest in terminating the respondent's parental rights is not diluted merely because a relative demands custody." In re Shane P., 58 Conn. App. 244, 262 (2000).
It must also be stated that the presentation by Marisa F. and Carmine F. was unpersuasive.[12] In particular, Marisa F. lacked credibility since she continued to assert that Kelly was hurt before she came back to Norma M.'s care in September, 1997 and that Kelly was not bonded to her foster mother. Neither proposition is worthy of belief. CT Page 9099
The fact that Kelly did not receive prompt medical attention while living with her aunt and uncle raises serious questions about their fitness as potential guardians for Kelly. It is clear that Kelly was not safe in their home. In addition, when Dr. Penn was in the process of doing his evaluation, he made repeated, unavailing attempts to meet with them in person. That they never made themselves available, except by phone, is evidence of their lack of commitment to Kelly.
Turning to Norma M., the court notes that it has discussed certain aspects of Kelly's best interest above at 25-26, in connection with the ground of no ongoing relationship. As noted. allowing her mother more time to develop a relationship with Kelly is not in her best interest.
The evidence is clear and convincing that termination is in Kelly's best interest. For good reasons, she has not been in Norma M.'s care for over two years and nine months. After being treated for her several fractures, she has been in foster care. Fortunately. she has bonded with her foster mother and is residing with a family where she is safe. She is in a stable setting which augurs well for her future.
Here, there is no reason to believe that Norma M. can ever assume a meaningful parental role in Kelly's life. Likewise, David R. has played no role at all in Kelly's life and cannot ever be expected to do so. To deny termination would leave her in prolonged foster care for no reason. As a result, she could be subjected to further legal proceedings concerning her guardianship when she is older, of which she could become aware, and which could be disruptive to her development. Since she is entitled to permanency and since time is of the essence, termination is in her best interest.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112
(d). See In re Tabitha P., 39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for Kelly and facilitated timely services to Norma M., including individual counseling. Visitation was scheduled until terminated by court order. Due to his unavailability, no services could be offered to David R. CT Page 9100
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF made reasonable efforts to reunify Kelly with Norma M. Such efforts became futile and inappropriate. Due to his unavailability, DCF could not make efforts to reunify David R. with Kelly.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
The terms of the court-ordered Expectations were set forth above at 2-3. The extent to which the parties complied with them is discussed above at 4-5, 11-15, and 18-20. DCF fulfilled its obligations as to her. No Expectations could have been ordered as to David R.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person who has exercised care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Based on the foregoing discussion, the courts finds that Kelly is bonded to her foster parents, particularly to her foster mother. She has no positive emotional ties to her mother. She has demonstrated negative emotional feelings concerning her mother. She has never known her father, David R.
5) The age of the child.
Kelly is just over three years and four months old. She has lived the substantial majority of her life in foster care.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that the efforts Norma M. made to participate in counseling, to visit Kelly, and to attend administrative case reviews, have not made it in Kelly's best interest to CT Page 9101 be placed with her mother in the foreseeable future. Kelly's father, David R., has made no efforts on Kelly's behalf of any kind.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Based on the foregoing discussion, neither Norma M. nor David R. faced unreasonable interference from anyone or from economic circumstances. Their respective circumstances were the results of their own actions and failures to act.
CONCLUSION
1. Based upon the foregoing findings, the court determines that it is in the best interest of Kelly M. for termination of parental rights to enter with respect to the mother, Norma M., and the father, David R. Accordingly, the court hereby grants the petition to terminate the parental rights of Norma M. and David R.
2. The court further orders that the Commissioner of DCF is appointed statutory parent to Kelly M.
3. The Commissioner shall file with the court no later than sixty days following the date of judgment a written report of efforts to effect permanent placement and file the further reports as are required by state and federal law.
It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT